[Civ. No. 9299. Third Dist. Dec. 18, 1958.]

H-R TRUCK AND EQUIPMENT COMPANY (a Corporation), Appellant, v. STATE BOARD OF EQUALIZATION, Respondent.

Fitzgerald, Abbott & Beardsley for Appellant.

Robert L. Pierce and Brobeck, Phleger & Harrison as Amici Curiae on behalf of Appellant.

Stanley Mosk and Edmund G. Brown, Attorneys General, James E. Sabine, Assistant Attorney General, and Ernest P. Goodman, Deputy Attorney General, for Respondent.

VAN DYKE, P. J.—Plaintiff and appellant, H-R Truck and Equipment Company, hereinafter called truck company, instituted this action against the defendant and respondent, State Board of Equalization, for the recovery of sales taxes paid under protest. Truck company now appeals from the adverse judgment of the trial court. The action was tried on a stipulation of facts, which stipulation was, by reference, adopted by the trial court as its findings of fact.

The first issue presented involves the interpretation and application of a statute exempting certain transactions from taxation under the Sales and Use Tax Act. The section is numbered 6385 of the Revenue and Taxation Code, and it reads as follows:

"There are exempted from the computation of the amount of the sales tax the gross receipts from sales of tangible personal property to a common carrier, shipped by the seller via the purchasing carrier under a bill of lading whether the freight is paid in advance, or the shipment is made freight charges collect, to a point outside this State and the property is actually transported to the out-of-state destination for use

by the carrier in the conduct of its business as a common carrier.''

It is the contention of appellant that all the requirements for exemption set up by section 6385 were fully met and that, therefore, the sales were not taxable. In support of this contention the truck company points to the following findings: The appellant truck company was, at all times material here, a dealer in trucks, truck tractors and parts and accessories therefor holding a retail seller's permit under the Sales and Use Tax Law. All sales involved were at retail. The measure of the tax (or volume of sales) on which the tax was imposed arose out of sales of trucks, truck tractors and truck parts, by appellant to truck common carriers engaged in interstate commerce, hauling by means of trucks and truck tractors under certificates of public convenience and necessity issued by the Bureau of Motor Carriers, Interstate Commerce Commission of the United States. These truck common carriers maintained local offices and freight stations in California and main offices in other states. The sales were made pursuant to oral contracts and as between the seller and the purchasers the parties understood that the seller would not be required to pay freight or cost of transportation to any out-of-state destination. The total price paid by the purchasers for each item was the price uniformly charged by the seller to all purchasers who bought, accepted and took possession of such goods at plaintiff's place of business in California. Payments for the purchases were received by the seller in California, but were made by such purchasers from their out-of-state places of business. The purchasing common carriers took delivery in California. (The stipulation of fact concerning deliveries and possession merely constituted a statement as to the taking of delivery or transfer of possession of the purchased property in sequence of events and was not intended as a stipulation to resolve the issue whether the purchasing carrier took delivery or possession of the property in California in their capacity as purchasers or as carriers.) At the time of taking delivery or possession, the purchasing carriers issued and gave to the seller documents designated as bills of lading. Such documents specified that the goods described therein were consigned to the respective purchasing carriers at the respective out-of-state destinations specified therein. The trucks and truck tractors were driven under their own automotive power by the drivers of each purchasing carrier to the specified out-of-state destinations over routes over which the purchasing

carriers were authorized to transport cargo under common carrier rights, for use by each said carrier in the conduct of its business as a common carrier and were so used. No freight was in fact charged to the seller, nor collected by any of the purchasing carriers on such movement of trucks, truck tractors and truck tractor parts, equipment and accessories. Freight bills were made out by the purchasing carriers but the said freight was deadheaded. The term "deadhead" indicates that freight is not a revenue load in that the freight is carried as company business.

The documents issued and designated bills of lading showed the following: The issuing carrier acknowledged that it had "RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading" the goods described in the bill "consigned, and destined as shown below" and that the carrier "agrees to carry to its usual place of delivery at said destination, if on its own . . . highway route or routes . . ." The bills also provided "It is mutually agreed, . . . that every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns." The bills specified that the described goods were consigned to the issuing carrier at a specific designation outside the state and on the route of the carrier and named appellant truck company as the shipper. The bills also provided that the consignee should pay the freight and all other lawful charges accruing on the described property.

The trial court found that title to the goods passed to the buyers at the time the carriers took possession in California. The validity of this finding is supported by the evidence.

 Neither party hereto challenges the validity of the exemption statute. The section refers to sales of tangible personal property to a common carrier and the sales here involved were such sales. It requires that the goods be shipped by the seller via the purchasing carrier under a bill of lading, and at least on the face of the transactions here involved that requirement is specifically met. The section states that whether freight is paid in advance or the shipment is made freight charges collect, the transaction shall be exempt if the property is actually transported to the out-of-state destination for use by the carrier in the conduct of its business as such and these requirements are likewise, at least on the face

of the transactions, specifically met. We think they are also met in substance. The Legislature has spoken and if it has spoken clearly its mandate must be obeyed as written. Notwithstanding both title and possession may have passed in California, it was open to the parties to agree that the goods still should be shipped by the seller via the purchasing carrier under a bill of lading. This was done, as is amply evidenced by the documents executed between the buyer and the seller as heretofore related. The section says nothing about the passage of title or possession. It is clear from the language used that the Legislature included within the exemption granted transactions where, though the goods were sold to a carrier, they might be shipped by the seller to that carrier, via that carrier with freight charges collect, that is to say, with no freight charges at all except as a matter of form. Such a transaction contains within it some measure of artificiality but it is the exempting statute which envisages that very artificiality. Therefore, in testing whether or not a transaction meets the requirements for exemption, the form becomes substantial. We hold that the transactions were carried out in such a way as to achieve the exemption provided for by the statute.

The principal contention of respondent is that the statute requires a bona fide relationship of shipper and carrier in order for a transaction to achieve exemption from the tax and that such bona fides did not exist here. We are not impressed with this argument. We see nothing in the way of a lack of good faith in a literal compliance with the statute. The Legislature set up the standards of exemption. If they are met there can be no claim that the avoidance of the tax proves bad faith. ''We do not speak of evasion, because, when the law draws a line, a case is on one side of it or the other, and if on the safe side is none the worse legally that a party has availed himself to the full of what the law permits.'' (*Bullen* v. *Wisconsin*, 240 U.S. 625 [36 S.Ct. 473, 60 L.Ed. 830, 835].) The seller was interested in avoiding the tax if that could legally be done. The issuance of the bill of lading and the other exemption requirements were material to him for that reason. Every retailer licensed under the sales and use tax is permitted to make sales which are exempt from tax, such as sales for resale, and is required in such cases to obtain required documents in proof of the exempt nature of the sales. Section 6385 sets up formal requirements and in these cases the truck company saw to it that they were complied with. In doing this it exercised a right given it by the law.

The conclusion we have come to is supported by the practical interpretation of the exemption statute adopted by those whose duty it has been to enforce the sales and use tax. ▉ The contemporaneous and practical construction of a statute by those whose duty it is to carry it into effect, while not controlling, is always given great respect. ▉ Contemporaneous interpretation of a statute long acquisced in by all persons who could possibly have an interest in the matter, has been held to be sufficient to justify a court in resolving any doubt it might have as to the meaning of ambiguous language employed by the Legislature in favor of sustaining such long unquestioned interpretation. (*People* v. *Southern Pac. Co.*, 209 Cal. 578, 594 [290 P. 25].)

The following transactions are recited in briefs of amici curiae: On November 18, 1948, and on January 27, 1949, the tax counsel for the board of equalization and the sales tax administrator respectively issued rulings holding that section 6385 applies with respect to certain sales of fuel oil to steamship companies. The rulings were issued in response to a memorandum outlining the basis upon which the transactions would be carried out and requesting a ruling thereon. It was pointed out that "It is proposed that the usual fuel oil contract used by Standard Oil Company of California be entered into between that company and any steamship company able to take advantage of the exemption. . . . The shipping company will be billed for the current price posted at the port of shipment, with freight charges to point of destination collect." A sample contract submitted with the memorandum to the board of equalization provided that the oil would be delivered by the seller on order of the buyer; that the price would be the seller's current price at time of each delivery for like deliveries as posted from time to time at the San Francisco Chamber of Commerce; that inspection and acceptance should take place at the time of delivery. The portion of the oil carried under the bill of lading to the out-of-state point was ruled exempt from tax under section 6385. The portion of the purchased oil which was consumed on the out-bound voyage and was not carried under the bill of lading was held taxable. On August 7, 1952, a similar ruling was made by the sales tax administrator, who wrote:

"Under Section 6385 of the Revenue and Taxation Code the sale of fuel oil to steamship companies will be recognized as exempt from sales tax, which fuel oil is:

"(a) Sold to a steamship company which is a common carrier, and which will use the fuel in the conduct of its business as a common carrier. For the purpose of establishing to the seller and the Board that the purchaser is a common carrier, and that the fuel oil will be used by the purchaser in the conduct of its business as a common carrier, purchasers will submit with each purchase a certificate in substance as follows:

"This is to certify that the XYZ Steamship Company, the purchaser of the above-described fuel oil is a common carrier; and that the fuel oil purchased free of sales tax is to be transported to an out-of-state destination for use by the XYZ Steamship Company in the conduct of its business as a common carrier . . .

"(b) Shipped by the seller via the facilities of the purchasing carrier under a bill of lading to an out-of-state point. Freight must be paid in advance or the shipment made freight charges collect. The freight must be shown on the bill of lading or accompanying freight bill and must be bona fide and bear a reasonable relation with freight rates set forth by established tariffs when such have been published.

"Sales of fuel oil with respect to which all of these conditions exist may be taken as a deduction on Item 11 of the seller's sales and use tax return under the caption 'Sales of Fuel Oil to Steamship Companies.'

"This letter supersedes the letter on the same subject dated January 27, 1949 . . . except the last paragraph thereof."

The last paragraph so referred to in the previous letter read as follows:

"It is understood that the tax applies with respect to sales of that fuel oil which will be consumed in the voyage from the California port where the oil is taken on to the first port of call outside of California."

It appears that in the work-out under these arrangements all the fuel oil purchased was carried in the deep tanks and bottom tanks of the carrier's vessel. A bill of lading would be issued for delivery of all fuel oil not needed for use of the vessel herself in going from a given point in California to the first port of call outside the state named in the bill of lading. The balance of the oil, used by the vessel after arriving at the port of delivery named in the bill of lading, was tax free. We are unable to distinguish the transactions which were the subject of these administrative rulings from the transactions in question in this case in any substantial way.

The same artificiality appears in both sets of transactions, but, as we have said before, that artificiality is permitted by the exemption statute which contemplates that it may exist.

Respondent contends that even if exempt status was achieved by the transactions involved yet as to certain of the transactions included, to wit, sales made to Navajo Freight Lines, Inc., a corporation, one of the carriers, this status was lost by reason of the actions of that carrier in using trucks and tractors it was transporting to out-of-state destinations to haul payloads on the way. We do not agree. Assuming that exempt status had been achieved by the dealings between the truck company and Navajo, the action of Navajo with respect to hauling payloads while engaged in transporting out of state the objects of sale could not affect the interest of the truck company, it not appearing that it had any knowledge, notice or responsibility for the conduct of Navajo. It is not Navajo that seeks exemption. The only evidence on the subject is that these actions of Navajo here relied upon by respondent as resulting in the truck company losing its exempt status is that the truck company did not know of these things until some four years after they occurred. Under these circumstances the truck company cannot be charged a tax by reason of this subsequent conduct of Navajo.

The judgment appealed from is reversed with instructions to the trial court to enter judgment in favor of appellant for the repayment to appellant of the sums paid under protest.

Peek, J., and Schottky, J., concurred.

A petition for a rehearing was denied January 8, 1959, and respondent's petition for a hearing by the Supreme Court was denied February 11, 1959. Traynor, J., was of the opinion that the petition should be granted.